|  |  |
|---|---|
| Marcia Harris,<br><br>Plaintiff<br><br>v.<br><br>France Telecom S.A., Cloud<br>Santé S.A.S., Neowave S.A.S.,<br>Dr. Patrice Cristofini, Dr. Yves<br>Miaux, Barbara Ngouyombo,<br>Hammond Bale Solicitors L.L.P.,<br>and Martin Bale,<br><br>Defendants | **United States District Court**<br>**Northern District of Illinois**<br><br>**FILED**<br><br>JAN 1 8 2011 **NF**<br>JAN 1 8 2011<br>MICHAEL W. DOBBINS<br>CLERK, U.S. DISTRICT COURT<br><br>11cv357<br>Judge James B. Zagel<br>Magistrate Susan E. Cox |

## COMPLAINT

### NATURE OF THE ACTION

This is an action for damages for violations of the Computer Fraud and Abuse Act, (18 U.S.C. § 1030 et seq.), the Racketeer Influenced and Corrupt Organizations Act, (18 U.S.C. §§ 1961 et seq.), the Illinois Trade Secrets Act (765 ILCS 1065 §§1 et seq.), the Illinois Uniform Fraudulent Transfer Act (740 ILCS 160 §§1 et seq.), as well as for breach of fiduciary duty and fraud.

Marcia Harris ("Harris") seeks injunctive relief and damages to remedy defendants' fraudulent and/or willful and malicious and/or grossly negligent conduct related to the operation of a sophisticated fraud scheme designed to destroy Harris's interests in a company holding the trade secrets and other assets developed by Anoigma Ltd. ("Anoigma") as well as related to the continuing deceptive practices of some defendants.

Harris alleges violations of the Racketeer Influenced And Corrupt Organizations Act against France Telecom S.A. ("France Telecom-Orange"), Dr. Patrice Cristofini ("Cristofini"), Dr. Yves Miaux ("Miaux), Barbara Ngouyombo ("Ngouyombo"), Neowave S.A.S. ("Neowave"), Hammond Bale Solicitors L.L.P. ("Hammond Bale") and Martin Bale ("Bale") (Claim II). Harris alleges violations of the Computer Fraud and Abuse Act against Ngouyombo (Claim I). Harris alleges violations of the Illinois Trade Secrets Act against all defendants (Claim III). Harris brings claims in common law fraud against France Telecom-Orange, Cristofini, Miaux, Ngouyombo, Cloud Santé, Hammond Bale and Bale under the laws of Illinois (Claim VI). Harris brings her claims for breach of fiduciary duty under Illinois law against defendants Cristofini, Miaux, Ngouyombo, Bale and Hammond Bale (Claim IV) and her claims under the Illinois Uniform Fraudulent Transfer Act against defendants France Telecom-Orange, Cristofini, Miaux and Ngouyombo (Claim V).

## THE PARTIES

1.      Plaintiff Harris is a U.S. citizen and a Chicago, Illinois resident who holds approximately 19% of the shares of the now-insolvent Anoigma, an English high tech health care sector company. She was both a director of Anoigma and an employee of Anoigma in the capacity of Chief Finance Officer ("CFO".)

2.      Defendant France Telecom-Orange is a company incorporated in France whose "principal place of business" is Paris, France. It provides various services from its Orange Business Services offices throughout the USA, which include an office in Chicago. Orange Business Services includes the Orange Healthcare division. The Orange Healthcare division includes Almerys as an operating entity.

3.    Defendant Cloud Santé S.A.S. ("Cloud Santé") is a French high-tech health care sector company located in Meyreuil, France.  In a judgment issued in Harris's favor in England on December 23, 2010 in *Marcia Harris v. Secretary of State for BIS and Others* ("*Marcia Harris v. Anoigma and Cloud Santé*"), a case related exclusively to Harris's unfair dismissal as an employee due to whistle blowing, the court found, inter alia, that Cloud Santé is the successor company of Anoigma.

4.    Defendant Neowave is a French company located in Gardenne, France that manufactures interactive USB sticks and other "smart objects" under the brand name Weneo. Neowave's Weneo products are distributed in the U.S. by ASK-intTag L.L.C. located in Essex Junction, Vermont and Green Bay, Wisconsin.

5.    Defendant Cristofini is a 3% shareholder of Anoigma, and a 10% shareholder of Cloud Santé.  Cristofini is Head of Partnerships and Strategic Alliances for the Orange Healthcare division of France Telecom-Orange in Paris, France.

6.    Defendant Miaux is the Science and Technology Adviser at the French Embassy in China.  He is a 5% shareholder of Anoigma, and a 23% shareholder of Cloud Santé. He is also an Advisory Medical Director at Synarc Inc. ("Synarc") where he oversees the Radiology Services Group.  Miaux is listed on Synarc's website with a telephone number at Synarc's headquarters in San Francisco, California.

7.    Defendant Ngouyombo is the majority shareholder of Anoigma and of Cloud Santé. She was the Chief Executive Officer ("CEO"), and a director of Anoigma.  She is now the President of Cloud Santé and, on information and belief, may reside in London, England or southern France.

Complaint:  Harris v.  France Telecom et al.                                          3 of 86 pages

8.    Defendant Hammond Bale is a law firm in London, England with offices in Paris, France.

9.    Defendant Bale is a partner in Hammond Bale.

10.    The actions alleged herein to have been undertaken by France Telecom-Orange, Neowave, Cloud Santé, Cristofini, Miaux, Ngouyombo, Hammond Bale and Bale (collectively, "Defendants" and each a "Defendant") were undertaken by each Defendant individually; were actions that each Defendant caused to occur; were actions that each Defendant authorized, controlled, directed, or had the ability to authorize, control or direct; and/or were actions in which each Defendant assisted, participated or otherwise encouraged; and are actions for which each Defendant is liable. Each Defendant aided and abetted the actions of the Defendants as set forth below, in that each such Defendant had knowledge of those actions, providing assistance to, and benefiting from, those actions, in whole or in part.

## JURISDICTION AND VENUE

11.    This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1332, in that at least one cause of action arises under the laws of the United States, there is diversity of citizenship among the parties, and the amount in controversy exceeds $75,000. The Court has jurisdiction over the state law claims under 28 U.S.C. § 1367(a) in that said claims are joined with substantial and related claims under the laws of the United States, and form "part of the same case or controversy" as those claims.

12.    This Court has personal jurisdiction over the Defendants because they purposefully availed themselves of the privilege of conducting activities in this forum or purposefully

directed their activities towards this forum. The Defendants caused harm to Harris in this

forum. Harris's claims arise from the Defendants' forum-related activities.

13.     Venue in this District is proper under 28 U.S.C. § 1391(b) since it is a judicial district

in which "any defendant may be found, if there is no district in which the action may

otherwise be brought." Defendant France Telecom-Orange may be found in this District

since it operates one of its North American offices in Chicago.   Venue in this District is

proper under 18 U.S.C. § 1965 1/16/96 since "(a) any civil action or proceeding under this

chapter against any person may be instituted in the district court of the United States for any

district in which such person resides, is found, has an agent, or transacts his affairs and (b) in

any action under 18 U.S.C. § 1964 for civil remedies in any district court of the United States

in which it is shown that the ends of justice require that other parties residing in any other

district be brought before the court, the court may cause such parties to be summoned, and

process for that purpose may be served in any judicial district of the United States by the

marshal thereof."


## THE FACTUAL BACKGROUND

### Background Summary

14.     Anoigma was created in 2008 as a high-tech health sector English start-up company.

Anoigma developed unique intellectual property in the form of a specialized software system

for the storage, transport and retrieval of personal electronic medical records (including

medical images and a database of medications with equivalents in a large number of

countries)  that also included a unique user interface system and the capacity to enable

individuals to carry their medical records on an interactive "smart" USB stick that could be


Complaint:  Harris v.  France Telecom et al.                                    5 of 86 pages

synchronized with on-line data, and that could be translated into various languages as needed

(the "Intellectual Property"), making it useful for, among others, expatriate corporate

employees and travelers with complex medical histories. Anoigma developed a prototype

that implemented the Intellectual Property (the "Prototype") and was close to completing a

"partnership" contract to sell an integrated product jointly with Almerys, an operating entity

of France Telecom-Orange ("France Telecom-Orange/Almerys") located in Clermont-

Ferrand, Toulouse, and Paris, France. Anoigma was attempting to attract additional investors

and had received strong expressions of interest from private sector investors, subject to

finalizing the terms of the contract with France Telecom-Orange/Almerys.

15.     France Telecom-Orange was very involved with Anoigma in a variety of ways

beyond the joint development with France Telecom-Orange/Almerys. France Telecom-

Orange signed a letter of intent in June 2009 expressing their interest in Anoigma. In

September 2009, and effective as of April 30, 2009, France Telecom-Orange's agent

Cristofini (the same person who had signed the letter of intent on behalf of France Telecom-

Orange in June 2009) acquired shares of Anoigma and the honorific title of non-executive

director in consideration for his involvement in Anoigma. Subsequent to this date, he

continued to take an active role in Anoigma.

16.     The Plaintiff (Harris) was an early stage investor in Anoigma, and was involved as a

shareholder, director and employee (CFO) of Anoigma. However, in mid- through late

November 2009, Harris became concerned that information was being concealed from

potential investors and informed Defendants Cristofini, Miaux and Ngouyombo of her

concerns. In response, these Defendants stopped communicating with Harris and closed her

Anoigma email account. That email address had been provided to potential investors to assist in their gathering diligence information about Anoigma prior to investing.

17.     Unbeknownst to Harris and with much effort at concealment by the Defendants, in or about late November 2009, Defendants began the process of setting up a French company (Cloud Santé) that was essentially the same company as Anoigma, except that the shares that had been Harris's were allocated between the agent of France Telecom-Orange and another former shareholder of Anoigma's. In *Marcia Harris v. Anoigma and Cloud Santé* decided in England on December 23, 2010 (a case related exclusively to Harris's unfair dismissal as an employee due to whistle blowing) the court recognized Cloud Santé as the successor to Anoigma and made their judgment in Harris's favor enforceable against Cloud Santé.

18.     There is considerable evidence that indicates that Defendants moved Anoigma's Intellectual Property and Prototype into Cloud Santé before Anoigma went into bankruptcy and took actions to ensure that Cloud Santé supplanted the positive business relations that had been developed by Anoigma with important suppliers and other relevant entities. For example, Defendants secretly committed Cloud Santé to pay certain of Anoigma's debts in the formation documents of Cloud Santé. At the same time as their concealed formation of Cloud Santé, Defendants engaged in a series of deceptive acts, including an offer to buy Harris's shares in Anoigma (at a greatly under-valued price) while threatening to put Anoigma into bankruptcy if Harris did not sell at that price. The Defendants subsequently put Anoigma into voluntary bankruptcy and then encouraged Harris to believe that it was possible to buy the Intellectual Property, Prototype, and other assets of Anoigma and re-start Anoigma.

19.     Harris withdrew from her attempt to buy Anoigma's assets after her diligence efforts

suggested that Neowave, the supplier of the "smart" USB sticks, and France Telecom-

Orange/Almerys had rolled over their contracts from Anoigma to Cloud Santé, despite their

confidentiality agreements with Anoigma. The Defendants largely maintained public silence

for almost a year about Cloud Santé until on or about November 2010 when Cloud Santé

published its website online. That website revealed that Cloud Santé had obtained financing

from the French regional government agency and had been awarded a regional prize, both

based, on information and belief, on the Intellectual Property, Prototype, and other assets of

Anoigma now in the possession of Cloud Santé. Also, a Cloud Santé profile published about

October 2010 on a website for an investment event revealed that Cloud Santé was offering

shares to investors on the basis of the Intellectual Property (which it acknowledged had been

developed 12 months earlier; i.e., before the establishment of Cloud Santé) and on the basis

of its partnership with France Telecom-Orange/Almerys.


**Basic Background Information**

20.     Anoigma was a company formed in August 2008 under the Companies Act 1985 of

England and Wales (as amended 1989 and 2006) ("Companies Act") and was registered with

Companies House, the U.K. registrar of companies ("Companies House"), an executive

agency of the U.K. Department for Business, Innovation and Skills ("BIS".) On that date,

Ngouyombo was registered with Companies House as a director ("Director") of Anoigma, its

sole Director at that time. Ngouyombo was also an employee of Anoigma with the job title

Chief Executive Officer and/or Chief Technology Officer. On or about December 1, 2008,

Harris became a Director of Anoigma and was registered with Companies House as a

Director in February 2009. She also became an employee (Managing Director) on or about December 1, 2008, and on or about July 2009, her job title as an employee was changed to CFO.

21.     The initial share capital as of August 21, 2008 was £1.00 divided into 1 ordinary (i.e., common) share ("Share") with a nominal value of £1.00 held by Ngouyombo. At a meeting of the Directors on October 28, 2008, a special resolution was taken to authorize and issue 100 ordinary shares with nominal value of £1.00 each. At a meeting of the Directors on February 2, 2009, a special resolution was taken to authorize and issue 4,899 ordinary shares. At a meeting of the Directors on July 13, 2009, after a resolution to amend the Articles of Association, a resolution was taken to authorize 1,000,000 ordinary shares and to reduce the nominal value of the ordinary shares to £0.10 each. Of these 1,000,000 authorized ordinary shares, only 52,507 were issued.

22.     On or about February 2, 2009, Harris purchased 1000 Shares of Anoigma for £1000. This represented 20% of the Shares at that time. On or about late June 2009, Miaux purchased approximately 5% of the Shares of Anoigma for approximately £37,500, representing a market value of £15.00/Share since the Shares had increased in value because of the advanced development of the Intellectual Property and the Prototype (as specified in greater detail below in paragraph 24). On or about early September 2009, Cristofini acquired, as of April 31, 2009, 1577 Shares, approximately 3% of the Shares of Anoigma, as consideration for his services to Anoigma as a non-executive director beginning as of April 31, 2009.

23.     As Anoigma developed its business relations and recognition of the value of its Intellectual Property and Prototype, the market value of the Shares increased. In September

2009, Anoigma circulated a business plan and term sheet to potential investors in which the

cost/Share (market value) of the shares was €26.67/share (or approximately £26.00/Share at

that time), based, in part, on a valuation of Anoigma's Intellectual Property and Prototype at

€800,000 (or approximately $1,200,000.)  This price was accepted by investors as realistic.

On or about February 1, 2010 at the time of liquidation/bankruptcy of Anoigma, there were

52,507 outstanding Shares of Anoigma, each with a nominal value of £0.10. These shares

were owned by the following people: Ngouyombo, 38,433 Shares (73.2%); Harris, 10,000

Shares (19%); Miaux, 2497 Shares (4.75%); Cristofini, 1577 Shares (3%).

24.     From approximately January 2009 through approximately June 2009, Anoigma paid

staff (including Ngouyombo) and external consultants to develop the Intellectual Property.

The Prototype implementing the software system was also developed by these staff and

external software consultants by approximately June 2009.  Because Anoigma paid for their

development, the Intellectual Property and the Prototype were the property of Anoigma.

25.     Some additional elements of functionality related to the synchronizability between the

USB stick and the online data (the "Added Functionality") were produced for Anoigma by

Jackson-Bramwell Ltd. ("Jackson-Bramwell") in September and October 2009 and

Ngouyombo used the Added Functionality in demonstrating Anoigma's product to France

Telecom-Orange/Almerys in October 2009.  The invoice for the Added Functionality was

included among the debts of Anoigma in the list provided to the liquidator by Ngouyombo.

The valuation of Anoigma in the term sheet circulated in November 2009 after the

production of the Added Functionality did not increase over the amount of the valuation in

the September 2009 term sheet, indicating that the Added Functionality did not significantly

increase the value to investors of the Intellectual Property and Prototype.

26.     In the United Kingdom and Europe, it is not possible to patent software innovations.

However, Anoigma's Intellectual Property and Prototype were protected by confidentiality or

non-disclosure agreements with Neowave (the supplier of the interactive "smart" USB

sticks), with other suppliers and in all cases where Anoigma entered into collaboration

partnerships with other companies or entities (such as with France Telecom-Orange/Almerys

and with university research units). The major asset of Anoigma was the Intellectual

Property and the Prototype.

27.     Only Ngouyombo (the CEO) and staff or consultants working directly with her knew

the Intellectual Property, and these staff or consultants had all signed confidentiality

agreements. Once this stage of development was complete, the contracts technology staff

were terminated. From on or about June 3, 2009, Harris and Ngouyombo were the only staff

members of Anoigma, and Ngouyombo was the only staff member who knew the details of

the Intellectual Property.

28.     Other important assets of Anoigma were: its supplier contracts, particularly its

contract with Neowave for exclusive supply of "smart" USB sticks in the healthcare sector

for a time-limited period; its joint product development/sales agreement with France

Telecom-Orange/Almerys; its contract with the incubation center in Meyreuil, France for

office space and business support; and its business relations with divisions of the French

government in the Provence Alpes Cote D'Azur ("PACA") region of France. These business

relations were part of ongoing applications for grant funding and other support from regional

government bodies.

29.     On or about late April 2009, France Telecom-Orange signed a Non-Disclosure

Agreement with Anoigma. Around this time, Cristofini and Ngouyombo began discussions

about Anoigma. On or about May 20, 2009, Harris and Ngouyombo, jointly on behalf of Anoigma, met with Cristofini in Paris at the offices of France Telecom-Orange. Cristofini is a senior executive of France Telecom and on information and belief, he reports directly to Thierry Zylberberg, Executive Vice President of France Telecom-Orange. Cristofini is Head of Partnerships and Strategic Alliances in the Orange Healthcare Division within Orange Business Services at France Telecom-Orange. This is the same division in which France Telecom-Orange/Almerys is located. On or about June 3, 2009, Cristofini sent a letter of intent to Anoigma on behalf of France Telecom-Orange. It reads, in part, as follows: "In the context of our current interactions and exchanges, we hereby inform you that we wish to assess together with you, the opportunity to utilize your technological solution, in relation with our current development of our offerings."

30.     From April 2009 through November 2009, France Telecom-Orange, through its agent Cristofini, exercised influence in Anoigma including: introducing potential investors; promoting Anoigma to potential investors; networking within France Telecom-Orange; and analyzing the viability of certain directions for corporate and product development. For example, Harris, Ngouyombo and Cristofini discussed the potential use of the software for electronic personal health records in citizens of countries in developing markets where use of this software on USB sticks or mobile phones could enable these countries to "leapfrog" over the steps taken by more developed economies. Cristofini told Ngouyombo and Harris by telephone that he was exploring the potential for such use in France Telecom-Orange's new ventures in former Soviet Union countries and other developing countries. An example of support inside France Telecom-Orange was Cristofini's recommendation, in an email dated

on or about June 1, 2009, to contact Pierre-Henri Manenq of France Telecom-Orange/Almerys.

31.    Over the same period, France Telecom-Orange, through its agent Cristofini, increased its involvement in Anoigma, as evidenced by the contract signed (on information and belief) between Anoigma and Cristofini in or about early September 2009 (the "Share Contract") which memorialized his involvement as a non-executive board member as of April 31, 2009. Cristofini acquired the Shares as indicated in the liquidation documents of February 1, 2010 and he also indicated his agreement to the terms of the Share Contract with only specified minor changes in an email he sent to Ngouyombo on or about September 5, 2009. The Share Contract makes evident that France Telecom-Orange was well aware of Cristofini's involvement as its agent since it included the clause that Cristofini "certifies that he has the right to enter into this agreement and that he has received all necessary approval to do so." By no later than the fall of 2009, Cristofini was speaking to Ngouyombo virtually daily, and advising her on a variety of matters. Despite his active involvement and his contracted title of non-executive director, Cristofini did not take on the legal responsibilities and obligations of being a Director formally registered with Companies House. Only Harris and Ngouyombo were so registered.

32.    The Share Contract also protected the confidentiality of Anoigma's Intellectual Property. The relevant clauses read as follows: "5.1 Unless otherwise agreed in writing, all intellectual property held by the Company (including but not limited to inventions, patents, trademarks, copyright, know how, designs, trade secrets and other proprietary rights or forms of intellectual property, and information that the Company has explicitly designated as confidential) and any alterations, additions or amendments to intellectual property shall

remain the property of the Company, or of a third party as notified to PC [Patrice Cristofini]
by the Company, and shall not be disclosed to any other person without the Company's
written consent. PC [Patrice Cristofini] agree[s] to take all reasonable steps to protect the
Company's intellectual property and ownership rights. 5.2 The terms of this Intellectual
Property clause will survive termination of this Agreement." Cristofini indicated his
agreement to these terms (since they were not the ones on which he requested minor
changes) in an email he sent agreeing to the Share Contract on or about September 5, 2009.

33.     Beginning on or about May 2009 through mid-November 2009, Harris, a native
English speaker fluent in French, and Ngouyombo, a native French speaker fluent in English,
attended various meetings seeking investment funding from private investors and from
various government funding agencies in London, England, Wales, and France. As part of the
materials needed for these potential grant applications, Harris prepared financial statements
for Anoigma. It was Harris's understanding that Ngouyombo was providing her with all the
information necessary to put together such documentation. Additionally, Ngouyombo asked
Harris for advice on cash management at various points and Harris responded based on
information provided by Ngouyombo, on the assumption that Ngouyombo was acting in
accordance with her fiduciary duty of transparency.

34.     In the summer of 2009, Harris began holding meetings with various persons in the
U.S., or from the U.S. on behalf of Anoigma and these meetings continued through late
November 2009. These persons included potential investors, representatives of potential
investors, potential clients, suppliers, and other potential partner organizations. Several of
these persons were located in Chicago (including suppliers, potential clients and
representatives of potential investors) and therefore Anoigma was purposefully directing

activities towards this forum and provision of information related to the offer of Shares of Anoigma took place in Chicago. Moreover, in August 2009, Harris shipped most of her furniture and a large amount of her personal chattels to Chicago, and conducted her activities on behalf of Anoigma from Chicago in the fall of 2009. Although Harris has taken trips away from Chicago, she has been living in Chicago continuously since September 2009.

35.    Harris's activities in Chicago included ongoing negotiations with France Telecom-Orange (in conjunction with Ngouyombo), in particular with France Telecom-Orange/Almerys. France Telecom-Orange/Almerys provides IT security and software for health care sector clients, such as insurance companies, and provides secure means of ensuring third-party payment in healthcare. On information and belief, there was a confidentiality agreement in place between Anoigma and France Telecom-Orange/Almerys. On information and belief, France Telecom-Orange/Almerys provided Anoigma with a letter of intent regarding partnering in relation to product development and sales. Among other joint activities, France Telecom-Orange/Almerys and Anoigma were developing a joint presentation to France Telecom-Orange/Almerys's client Mobility St Honoré, the largest worldwide provider of insurance to expatriate corporate employees, with global presence including presence in Chicago.

36.    Harris's activities in Chicago included ongoing communication with Cristofini, again in conjunction with Ngouyombo. On behalf of France Telecom-Orange, Cristofini was exploring opportunities for other partnerships between Anoigma and France Telecom-Orange. As expressed on a page of France Telecom-Orange's website under Orange Healthcare entitled Deploying France Telecom's E-health Strategy, "For Orange, a partnership approach is essential to truly addressing the vast needs of the healthcare market."

http://www.orange.com/en_EN/group/activities_key/health/e-health-strategy.jsp. France

Telecom-Orange has also been expanding in the healthcare sector through the acquisition of

subsidiaries. France Telecom-Orange acquired France Telecom-Orange/Almerys and France

Telecom-Orange/Almerys has since acquired Enora Technologies (providing specialist

medical software services for athletes) in 2009 and Alsy France Regions (providing software

services including portal and content management) in 2010. Acquisition by France Telecom-

Orange was a conscious potential exit strategy for Anoigma. Both partnership and

acquisition were possible ways of implementing "the opportunity to utilize your

technological solution, in relation with our current development of our offerings" indicated in

the letter of intent from France Telecom-Orange signed by Cristofini cited above in

paragraph 29.

37.     Harris's activities in Chicago included ongoing communications with Neowave

(again in conjunction with Ngouyombo) regarding partnered activities including Anoigma's

presence at Neowave's stand at a trade exhibition in Paris in mid-November 2009 and

Neowave sending out samples of Anoigma's product to its clients as part of its invitation to

the trade show. On information and belief, there was in place between Anoigma and

Neowave both a confidentiality agreement, which enabled sharing the Intellectual Property

for production of the Prototype and of future products, and a contract for Neowave to supply

Anoigma with products and to give Anoigma exclusivity as Neowave's client in the

healthcare sector for a time-limited period.

38.     Harris's activities in Chicago included (again in conjunction with Ngouyombo):

monitoring the formation of a wholly owned subsidiary of Anoigma to be called Anoigma

S.A.S. ("Anoigma SAS") in France; application for an office in an incubation center in

Meyreuil, southern France; and application for various French government funding and research opportunities in the PACA region of France where Meyreuil is located. Admission to space in the incubation center, which is highly competitive and involves a complex application process, comes with various types of financial support. On or about late October 2009, Anoigma SAS was set up, and Anoigma was granted the last open space in the incubation center in Meyreuil, France. On or about December 4, 2009, the center issued a press release announcing the admission of Anoigma as a new tenant/supported member.

39. On or about December 3, 2009, Harris returned to Chicago from London after a visit of about six weeks. At that time, and until her removal on January 5, 2010, Harris remained a Director of Anoigma. In *Marcia Harris v. Anoigma and Cloud Santé*, the court determined, inter alia, that Harris remained employed as CFO of Anoigma until January 5, 2010. Therefore, since Harris was both a Director and CFO of Anoigma until January 5, 2010, Anoigma had presence in Chicago at least until that date. According to Note 6 of the Statement of Affairs provided by Ngouyombo to Griffin and King Ltd., United Kingdom licensed insolvency practitioners, ("Griffin and King" or the "Liquidators") on February 1, 2010, Anoigma "ceased trading with effect from 6th January 2010" although the shareholders' meeting that authorized voluntary liquidation did not take place until February 1, 2010.

40. The judgment in the case of *Marcia Harris v. Anoigma and Cloud Santé* was mailed to the parties on December 29, 2010 with an anticipated receipt date of January 4, 2011. Payment became due on that date, with interest on the unpaid amount beginning to accrue at 8% per annum on February 15, 2011. The court ordered Cloud Santé to pay Harris a total of £295,107 (or approximately $464,705.) in a combination of unpaid salary, and compensatory

and punitive damages related to unfair dismissal due to whistle blowing. After hearing

nothing from Cloud Santé or its lawyers, Harris sent an email on January 9, 2011, which

asked about the expected date and method of payment, to Cristofini, Miaux, Ngouyombo,

and Bale as well as to the Marseilles, France office of Landwell and Associates, the French

division of Landwell Global, a law firm associated with PriceWaterhouseCoopers PC

("Landwell"), who are, on information and belief, the law firm of Cloud Santé. Harris has

received no response of any kind from any of these persons.


## CLAIM I – COMPUTER FRAUD AND ABUSE ACT

Against Defendant Ngouyombo

41.    Harris incorporates and realleges each and every allegation contained in paragraphs 1

to 40 inclusive of this Complaint.

42.    The Computer Fraud and Abuse Act provides a civil right of action for a violation of

the Computer Fraud and Abuse Act, provided that the conduct complained of involved a

"loss to one or more persons during a 1-year period . . . aggregating at least $5,000 in value."

Relevant violations are set forth at 18 U.S.C. 1030(a)(2)(C) (unlawful to intentionally access

a protected computer without authorization or in excess of one's authorization and thereby

obtain information); 18 U.S.C. 1030(a)(4) (unlawful to knowingly, and with the intent to

defraud, access a protected computer without authorization or in excess of one's

authorization, and by means of such conduct further the intended fraud and obtain anything

of value.)

43.    "A 'protected computer' includes a computer 'which is used in interstate or foreign

commerce or communication.' 18 U.S.C. § 1030(e)(2). Computers connected to the Internet

and that are "used to send and receive e-mail . . . throughout the country...qualify as a protected computer under the CFAA." Credential Plus, LLC v. Calderone, 230 F. Supp. 2d 890, 906 (N.D. Ind. 2002).

44.     As specified above in paragraphs 24 to 26 inclusive, the Intellectual Property was owned exclusively, and paid for, by Anoigma. Only the Added Functionality was left unpaid at the time of Anoigma's voluntary liquidation but the invoice for it was included as a debt of Anoigma's. The fact that the Defendants later secretly agreed to pay this debt of Anoigma's does not constitute a legal means of transferring ownership of even the Added Functionality, and certainly does not transfer ownership of any other aspect of Anoigma's Intellectual Property. Because Ngouyombo was an employee of Anoigma when it developed the Intellectual Property and the Added Functionality, there is likewise no basis for Ngouyombo to claim that she personally owned Anoigma's Intellectual Property, Prototype or Added Functionality.

45.     From on or about June 3, 2009, Ngouyombo was the only staff member who had access to the Intellectual Property and the Added Functionality. Because of the inclusion of an on-line data base as part of both the Intellectual Property and the Added Functionality, both of them by their nature involve use of a "protected computer" since the on-line data base can only be accessed over the internet. As specified above in paragraphs 33 to 38 inclusive, Anoigma was engaged in interstate and foreign commerce. Since Ngouyombo used the same computer for sending and receiving email in interstate and foreign commerce, the computer would also qualify under that measure as a "protected computer."

46.     As specified above in paragraph 23, the Intellectual Property and Prototype were valued in September 2009 at about €800,000, or about $1,200,000 at then-current exchange

rates. As specified above in paragraph 25, this valuation remained the same even after the inclusion of the Added Functionality.

47.     While Harris was still CFO and a Director of Anoigma and while Harris was in Chicago, on or about December 21, 2009, Cristofini, Miaux and Ngouyombo filed documents with Bank National Paribas related to the establishment of Cloud Santé, a "company in formation." These documents included their names as the three subscribing shareholders setting up the company and their financial payments for the purchase of shares. This date was also before January 6, 2010, the date indicated in the letter from the Liquidators of January 7, 2010 as the date they were approached to put Anoigma into bankruptcy on the basis of insolvency. However, the Defendants took these actions secretly. The information in this paragraph and in paragraphs 48 to 51 inclusive below did not become publicly available on the internet until much later, and Harris was unaware of them for several months. Indeed, these documents can be purchased only with a French credit card from the French website Manageo located in Aix-en-Provence, France, and the website is difficult to navigate even for someone in France.

48.     Anoigma continued to own its own assets until the shareholders meeting on February 1, 2010 when its shareholders voted to put Anoigma into voluntary liquidation. At that point, the assets moved into the control of the liquidator. According to the Manageo website record of documents filed with the French Commercial Registry in Aix-en-Provence, France, Cloud Santé started doing business on January 11, 2010 and according to the Manageo corporate summary report, Cloud Santé started doing business on January 1, 2010. Both dates are during the time when Anoigma still had control over its own assets, and when Ngouyombo,

as majority shareholder, CEO and the sole remaining Director of Anoigma, had the full range of fiduciary duties both to Anoigma and to Harris.

49.     The change of their shareholding from Anoigma to Cloud Santé was particularly significant for Cristofini (agent of France Telecom-Orange) and Miaux since Cristofini's shareholding increased from 3% to 10% and Miaux's shareholding increased from 5% to 23%.  Since Cristofini paid only €10 for his 10 shares, constituting 10% of the total 100 shares, and Miaux paid only €23 for his 23 shares, constituting 23% of the total, these two shareholders significantly increased their share ownership for a minimal outlay of money. The difference between their previous shareholdings in Anoigma and their shareholdings in Cloud Santé was more or less equivalent to the number of Shares held by Harris in Anoigma. Harris was not allocated any shares in Cloud Santé.

50.     The new company was listed in the documents filed with Bank National Paribas in December 2009 as being located at the incubation center in Meyreuil, France where Anoigma's admission had been announced only three weeks earlier.  On information and belief, Anoigma had taken the last space available in that center.  Therefore, Cloud Santé's presence there would have been through usurping Anoigma's space. The purpose of the company was truncated on the document filed with Bank National Paribas and said only (in French) "development and exploitation of" without completing the sentence.

51.     On or about January 6, 2010, Statuts (Formation Documents) of Cloud Santé and related annexes were signed in London.  Cristofini, Miaux and Ngouyombo were the shareholders and Ngouyombo was designated President.  These Statuts stated (in French) that the company has as its object, in France and abroad, the development and exploitation of products and services involving virtual and paperless commerce related to health solutions

permitting and facilitating travel and/or access to such services and medical information in a technological solutions ecosystem. This was virtually identical to the ways Anoigma had described itself in various documents. In other words, the purpose of the new company was the same as the purpose of Anoigma.

52.    Without investing the approximately fourteen months of time of product development that Anoigma had spent (and therefore not having intellectual property equivalent to Anoigma's Intellectual Property), Cloud Santé would have been at a significant competitive disadvantage relative to Anoigma. However, only about four months later, according to the website of Cloud Santé and the link on it to the website of the PACA [regional French] Research Network, Cloud Santé was awarded a prize in April 2010 for commercialization of tools for managing electronic personal medical records on line, on USB sticks and on mobile phones (Commercialisation d'outils de gestion de dossiers médicaux électroniques personnels synchronisés sur terminaux mobiles, en ligne et sur clef USB intelligente), i.e., exactly what Anoigma's Intellectual Property provided. Such an award for "commercialization of tools" could only have been won by Cloud Santé having used Anoigma's Intellectual Property and Prototype as specified above in paragraphs 24 to 26 inclusive and 44. The prize included various research and business support, as well as access to interest-free loans. Again, this information did not become available on line until on or about November 10, 2010.

53.    The use of Anoigma's Intellectual Property and the head-start it provided to Cloud Santé is even more explicit on Cloud Santé's profile on the website of the Investment Forum (www.foruminvest.com) set up in advance of Cloud Santé's participation in the Investment Forum in Paris, France on or about October 8 to 10, 2010. Both the Investment Forum and the website are run by the Win Agency located in Paris, France. Cloud Santé's Investment

Forum website profile, still maintained, is directed at potential purchasers of the shares of

Cloud Santé, and claims that Cloud Santé benefits from a technological lead of 12 months

(i.e., from technology it purportedly developed no later than September/October 2009 when

Cloud Santé did not exist.) Most probably, the twelve months refers to Anoigma's at least

fourteen months of product development.

54.    It is instructive to compare the exact company and product descriptions of Anoigma

and Cloud Santé. In November 2009, Anoigma used the following description in an

executive summary for investors: "Anoigma offers an innovative, cost-effective, integrated

solution for storage and access of electronic Personal Health Records (PHR) that facilitates

cross-border healthcare by enabling portability and continuity of travellers' medical data. The

first product is…a smart USB stick with an embedded advanced web application that allows

individual patient records to be carried with the patient, stored securely online for both

domestic and international use, be accessible and updated at will by both the patients and the

medical professionals. The system solves the traditional problems and pitfalls of trans-

national medicine: • by translating the medical records (doctor's notes, drug names, their

equivalencies in 35 countries and corresponding dosages) into the local language and

pharmaceuticals for countries visited; • by storing diagnostic quality x-ray images relevant to

each treatment (for display and download); and • by synchronising the off-line content with

multiple web services thus enabling flexibility and openness of use." In the Eurobiomed

Directory of Members for the PACA and Languedoc-Rousillion regions of France as of

November 2010, Cloud Santé described itself as follows: "Cloud Santé offers innovative

solutions for electronic Personal Health Records access that are portable and available in

different languages. By using technologies such as SIM, NFC, smart cards for USB, Cloud

Santé's added value is interoperability of medical record access in a comprehensive

ecosystem (web, USB sticks, mobile phones.) The solutions are innovative and include an

embedded advanced web application, translations of the medical records (doctor's notes,

drug names, their equivalencies in 35 countries and corresponding dosages and potential

interactions), quality x-ray images and synchronization of the off-line embedded content with

multiple web services." The only difference between them is the reference to mobile phones

in the more recent description, but Anoigma was exploring the potential use of its product in

mobile phones before November 2009 since the "smart" USB stick produced by Neowave

also contains an NFC wireless connection to certain types of mobile phone.

55.    On or about March 16, 2010, Harris sent a letter to the liquidators indicating problems

regarding inadequate valuation of Anoigma (since there was no valuation provided other than

the value of the cash on hand in the bank) in light of Anoigma's previously high valuation.

That valuation, based on Anoigma's Intellectual Property and Prototype was expressed in

documents sent to potential investors, and was accepted as a realistic valuation by those

investors. Harris's letter also raised related questions about what due diligence had been

conducted, where the Intellectual Property was now held and whether it had been transferred

to Cloud Santé.

56.    On or about April 24, 2010, Griffin and King sent a letter to Harris indicating that

they had not seen the valuation described by Harris in paragraph 23 above and requesting

copies of documentation for it (which she subsequently sent.) Griffin and King provided a

statement from Ngouyombo affirming that there was no relationship between Cloud Santé

and Anoigma Ltd. This letter also stated, "I can confirm that I have not sold any IPR

[intellectual property], nor has Miss Ngouyombo confirmed it as being sold to Anoigma SAS or to Cloud Santé."

57.     However, contrary to these statements caused to be sent by Ngouyombo, Anoigma's Intellectual Property held on Ngouyombo's protected computer moved from Anoigma to Cloud Santé before Anoigma went into liquidation and, most probably, while Harris, in Chicago, was still a Director and CFO as well as a shareholder of Anoigma. As early as December 21, 2009, Cloud Santé was giving its address as being in the incubation center in Meyreuil, France and is therefore likely to have had the Intellectual Property transferred into it at that time. Since Ngouyombo was the only person inside Anoigma who knew Anoigma's Intellectual Property and since she is now the President of Cloud Santé and Cloud Santé is in possession of this Intellectual Property, there is every evidence that her knowing transfer of this information was the means by which these assets came to repose in Cloud Santé and not in Anoigma.

58.     Ngouyombo owed fiduciary duties to Harris and to Anoigma because shareholders of a closely held company owe fiduciary duties of loyalty to the company and to the other shareholders. As laid out in Sain v. Nagel, 997 F.Supp. 1002, 1016 (N.D.Ill. 1998), "A shareholder in a close corporation owes a duty of loyalty to the corporation and to the other shareholders. Rexford Rand Corp. v. Ancel, 58 F.3d 1215, 1218 (7th Cir. 1995) (citations omitted). Accordingly, shareholders have the obligation to 'deal with the utmost good faith, fairly, honestly, and openly with their fellow stockholders.' Id. at 1219 (citation omitted). Fiduciaries should not actively exploit their positions within the corporation for their own personal benefit or hinder the ability of a corporation to continue the business for which it was developed. Dowd & Dowd, Ltd., 220 Ill.Dec. 37, 672 N.E.2d at 862 (citations omitted).

Under the corporate opportunity doctrine, 'one who occupies a fiduciary relationship to a corporation may not acquire, in opposition to the corporation, property in which the corporation has an interest or tangible expectancy or which is essential to its existence.' Regal-Beloit Corp. v. Drecoll, 955 F.Supp. 849, 859 (N.D.Ill.1996) (quotation and internal citation omitted)." See also Monfardini v. Quinlan, 2004 U.S.Dist. LEXIS 4054 at *15 (N.D.Ill. Mar. 11, 2004) where the court held that minority shareholders of a closely held corporation have a duty "not to damage the corporate interests."

59.     The U.S. Court of Appeals for the Seventh Circuit has held that a breach of fiduciary duty is a basis for determining what constitutes "access[ing] a protected computer without authorization or in excess of one's authorization." See, for example, International Airport Centers LLC v. Citrin, 440 F.3d 418 (7th Cir. 2006). See also Forge Industrial Staffing Inc. v. De La Fuente, 2006 U.S. Dist. LEXIS 75286 (N.D. Ill. Oct. 16, 2006 *15-18) which followed Citrin and ruled that an employee's access was unauthorized under the Computer Fraud and Abuse Act because his authorization ceased when he engaged in the alleged conduct which could constitute a breach of his duty of loyalty to the company.

60.     The assets including the Intellectual Property should have remained with Anoigma, and at the time of Anoigma's bankruptcy, Harris would have been entitled to 19% of the realizable value of these assets, after the payment of other creditors, who would have been able to be paid in full. (As it was, on information and belief, no creditor of Anoigma, except the Liquidators, received any payment.) Anoigma's outstanding debts, as indicated in the papers from the Liquidators, were only about £36,000 (or about $58,000 at then-current rates). These debts did not include the unpaid salary to Harris. Harris's unpaid gross salary for 2009 of £125,000 (or about $205,000 at then-current rates) and the first week of 2010 of

£4807 (or approximately $7900) (as memorialized in Harris's email to Ngouyombo of November 15, 2009 and as awarded (net of taxes) in *Marcia Harris v. Anoigma and Cloud Santé* on December 23, 2010) would have been covered by the value of the assets, with a remainder for Harris's 19% shareholder value greater than the $5000 minimum loss needed to provide a right of action under the Computer Fraud and Abuse Act, even if the assets had been sold for half or one-third of their value.

61.      However, since Cloud Santé is the successor to Anoigma, and since Harris should have had an equivalent shareholding in either Anoigma or Cloud Santé if she had not been defrauded of that shareholding, Harris's loss was 19% of the value to be gained by Cloud Santé on the basis of its possession of the Intellectual Property.  Harris has been directly injured because she was defrauded of her shares in Anoigma/Cloud Santé and has consequently lost their previous, present and future value.

# CLAIM II – RACKETEER INFLUENCED AND CORRUPT

## ORGANIZATIONS ACT

### Count 1: 18 U.S.C. § 1962 (c)

Against France Telecom-Orange, Cristofini, Ngouyombo and Miaux aided and abetted by Hammond Bale and Bale

62.      Harris incorporates and realleges each and every allegation contained in paragraphs 1 to 61 inclusive of this Complaint.

63.      Harris is claiming under the private right for treble damages provided under 18 U. S. C. §1964(c) to "[a]ny person injured in his business or property by reason of a violation" of

the Act's criminal prohibitions. "Congress provided civil RICO plaintiffs with the

opportunity to recover treble damages, costs, and attorney's fees if they can successfully

establish the elements of a RICO violation by a preponderance of the evidence. Sedima,

S.P.R.L. v. Imrex Co., 473 U.S. 479, 491-93, 105 S.Ct. 3275, 3282-83, 87 L.Ed.2d 346

(1985)." Midwest Grinding Company Inc v. M Spitz U.S. 976 F. 2d 1016 at paragraph 9.

(http://openjurist.org/976/f2d/1016/midwest-grinding-company-inc-v-m-spitz-us)

64.     The elements of a Racketeer Influenced and Corrupt Organizations Act violation

under 18 U.S.C. § 1962 (c) "consist of '(1) conduct (2) of an enterprise (3) through a pattern

(4) of racketeering activity.'" Id. citing Sedima 473 U.S. 479 at 496, 105 S.Ct. at 3285.

"Generally, to establish a claim under section 1962(c), the plaintiff must prove that (1) a

defendant person (2) was employed by or associated with an enterprise (3) that engaged in or

affected interstate commerce and that (4) the defendant person operated or managed the

enterprise (5) through a pattern (6) of racketeering activity, and (7) the plaintiff was injured

in its business or property by reason of the pattern of racketeering activity." Jeffrey E. Grell,

Esq., Rico in a Nutshell, accessed December 30, 2010, II A (http://www.ricoact.com/

ricoact/nutshell.asp).

65.     In this claim, Anoigma and Cloud Santé are, where relevant for the sake of clarity,

treated as a single entity called Anoigma-Santé both because this is the way they were treated

by the Defendants (as specified for example above in paragraph 50 to 54) and because of the

finding of the English court specified above in paragraph 17 that Cloud Santé is the successor

of Anoigma. They are differentiated as Anoigma and Cloud Santé where that differentiation

is necessary for clarity. Anoigma-Santé (the company now called Cloud Santé) is the

"enterprise" in Racketeer Influenced and Corrupt Organizations Act terms for this claim; i.e.,

what can be understood as the "front" for the racketeering activity  As indicated in United
States v. Turkette, 452 U.S. 576, 580-81 (1981), an enterprise for a Racketeer Influenced and
Corrupt Organizations Act claim can be a company, which may actively engage in, or be
passively used for, the racketeering activity. See National Organization for Women v.
Scheidler, 510 U.S. 249, 259 n.5 (1994).  The enterprise is thus distinguished from the
racketeering activity.  It is also distinguished from the Defendant persons since, under
common law, a person cannot conspire with himself. River City Markets, Inc. v. Fleming
Foods West, Inc., 960 F.2d 1458, 1461 (9th Cir. 1992).  As Anoigma, the enterprise engaged
in or affected interstate commerce, as specified in paragraphs 33 to 38 above, and as Cloud
Santé, it continues to do so since it is, for example, continuing to work in partnership with
France Telecom-Orange/Almerys to develop collaborative products for the latter's clients
such as Mobility St. Honoré, as indicated in paragraph 35 above.

66.     The Defendant persons for this claim are alleged to be France Telecom-Orange,
Cristofini, Ngouyombo and Miaux aided and abetted by Hammond Bale and Bale.  France
Telecom-Orange (through its agent Cristofini), Ngouyombo and Miaux are the three
shareholders of Cloud Santé, and are thus "associated with" the enterprise.  Hammond Bale
and Bale are the law firm and the lawyer, respectively, who advised at least two and possibly
all three of these persons in their capacities as shareholders of Anoigma.

67.     After signing a Non-Disclosure Agreement with Anoigma-Santé in or about April
2009, France Telecom-Orange (in collaboration with the other Defendants named for this
count) embarked on a pattern of racketeering activity to infiltrate the original enterprise
(Anoigma), subverting and re-constituting it as a new corporate structure with control by
France-Telecom-Orange (Cloud Santé) and with the assets of the original enterprise acquired

by "improper means." It was in the context of France Telecom-Orange's involvement that in or about the second week of September 2009, effective April 30, 2009, Ngouyombo sold 1577 of her shares in Anoigma to Cristofini, the agent of France Telecom-Orange. By making the Share Contract that also gave Cristofini the title of non-executive director of Anoigma effective as of April 30, 2009, France Telecom-Orange was reflecting its actual involvement back to this date, and therefore indicating that the strategy underlying the pattern of racketeering activity by France Telecom-Orange began no later than April 30, 2009.

68.     France Telecom-Orange's ongoing purpose in the enterprise has been to gain control of the enterprise to use it for its own purposes through engaging in a variety of predicate acts (the pattern of racketeering activity.) The purpose(s) of gaining control without actually acquiring the enterprise may be one or more of the following:  (a) to use Cloud Santé as a way to test the Intellectual Property and Prototype without impacting France Telecom-Orange (so that France Telecom-Orange would not lose prestige if the technology fails); (b) to attract finance from government programs for small businesses, for which France Telecom-Orange would not be eligible; (c) to attract finance from private sector investors as well as government in order to have others pay for the initial development of the enterprise to a point where it would be profitable for favorable acquisition or some other type of partnership favorable to France Telecom-Orange; and (d) through the participation of third-party investors, to shield France Telecom-Orange from suspicions of fraudulent manipulation of the enterprise.

69.     This is not to say that the other defendants are innocent; they are not. They knowingly engaged or collaborated in a variety of predicate acts as part of the racketeering

activity, and they continue to do so. The Defendants are actively looking for new investors into Cloud Santé, and they continue to perpetrate wire fraud (and potentially mail and bank fraud) vis-à-vis these investors. The Defendants also presumably continue to solicit financial and other support from governmental programs and these acts continue the perpetration of mail, wire and potentially bank fraud. In addition, the Defendants continue to work towards bringing in new customers and therefore continue to perpetrate mail and wire fraud in this context too. These ongoing acts facilitate the accomplishment of the purpose(s) of France Telecom-Orange suggested in paragraph 68 above.

70.      France Telecom-Orange is clearly the central "Defendant person" conducting the enterprise that is engaged in the racketeering activity. Of all the Defendants, it is particularly in France Telecom-Orange's interest and capacity to do so. It has the resources to be able to gain the most advantage from the enterprise and is best positioned with the sophistication, skill and presence to be able to manage it both in the short-term and in the long-term. As specified in paragraph 36 above, France Telecom-Orange is growing in the healthcare sector through a combination of partnerships and acquisitions. As specified in paragraph 29 above, Telecom France-Orange's agent Cristofini is a senior executive at France Telecom-Orange in the division that supervises France Telecom-Orange/Almerys. He is also a key player inside Cloud Santé, conducting it on behalf of France Telecom-Orange through his ownership of 10% of its shares, and through his influence over Ngouyombo. As indicated in paragraph 31 above, Cristofini was speaking to Ngouyombo virtually daily and advising her on a variety of matters, beginning no later than the fall of 2009.

71.      Nevertheless, both Ngouyombo and Miaux also "have some part in directing [the enterprise's] affairs," (based on the "operation or management" test articulated in Reves v.

Ernst & Young, 113 S. Ct. 1163, 116870 (1993), referring to Bennett v. Berg, 710 F.2d 1361, 1364 (8th Cir. 1983) (en banc).) Consequently they too can be held liable for such "conduct" of the enterprise's affairs.

72.    After France Telecom-Orange infiltrated Anoigma, it engaged in predicate acts that led to the (fraudulent) bankruptcy of Anoigma and, prior to that bankruptcy, to the formation of Cloud Santé in which France Telecom-Orange (through its agent Cristofini) had a much bigger shareholding, and which acquired the Intellectual Property and other assets of Anoigma without paying for them and without acknowledging that they had them. To the contrary, the Defendants caused fraudulent misrepresentations to be mailed and emailed to Harris claiming that Cloud Santé had not acquired the Intellectual Property assets of Anoigma, as specified above in paragraph 56.

73.    Defendants France Telecom-Orange, Miaux and Ngouyombo, aided and abetted by Defendants Hammond Bale and Bale, engaged in "racketeering activity" as defined in 18 U.S.C. 1961(1)(B). The predicate acts underlying the Defendants racketeering scheme are the transportation of stolen goods in interstate or foreign commerce, bank fraud and acts of mail and wire fraud.

74.    "A pattern of racketeering activity consists of at least two predicate acts of racketeering committed within a ten-year period. 18 U.S.C. § 1961(5). Predicate acts are acts indictable under a specified list of criminal laws, 18 U.S.C. § 1961(1) (B), including mail fraud under 18 U.S.C. § 1341, and wire fraud under 18 U.S.C. § 1343." Midwest 976 F. 2d 1016 at paragraph 9. Predicate acts can also include the transportation of stolen goods in interstate or foreign commerce under 18 U.S.C. § 2314, and bank fraud under 18 U.S.C. § 1344.

75.     However, "a civil RICO plaintiff may no longer get by merely alleging two predicate acts, but must also satisfy the so-called 'continuity plus relationship' test: the predicate acts must be related to one another (the relationship prong) and pose a threat of continued criminal activity (the continuity prong). H.J., Inc., 492 U.S. at 239, 109 S.Ct. at 2900; Sedima, 473 U.S. at 496 n. 14, 105 S.Ct. at 3285 n. 14." Midwest 976 F. 2d 1016 at paragraph 18.

76.     The predicate acts alleged here constitute acts of transportation of stolen goods in interstate or foreign commerce, bank fraud, mail fraud and wire fraud in a number of separate schemes that meet the relationship prong, since they together form a pattern of related acts that underlie France Telecom-Orange's strategy of taking control of Anoigma-Santé, moving the assets from the original enterprise (Anoigma) into its new incarnation (Cloud Santé) by "improper means," and attracting finance from various sources including government programs and private sector investors for the purposes alleged in paragraph 67 above.

77.     Title 18, section 2314 of the U.S. Code is violated whenever a person (1) has knowledge that certain property has been stolen or obtained by fraud, and (2) transports the property, or causes it to be transported, in interstate commerce. Pereira v. United States, 347 U.S. 1, 9 (1954). Specifically, § 2314 provides that "Whoever transports, transmits, or transfers in interstate or foreign commerce any goods, wares, merchandise, securities or money, of the value of $5,000 or more, knowing the same to have been stolen, converted or taken by fraud; or Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transports or causes to be transported, or induces any person or persons to travel in, or to be transported in interstate or foreign commerce in the execution or

concealment of a scheme or artifice to defraud that person or those persons of money or
property having a value of $5,000 or more; …Shall be fined under this title or imprisoned not
more than ten years, or both."

78.     As alleged in Claim I under the Computer Fraud and Abuse Act, paragraphs 41 to 61
inclusive above, Claim III under the Illinois Misappropriation of Trade Secrets Act,
paragraphs 153 to 168 inclusive below, and Claim V under the Illinois Fraudulent Transfer
Act, paragraphs 188 to 191 inclusive below, the Defendants fraudulently converted the
Intellectual Property and Prototype of Anoigma valued at about $1,200,000 to Cloud Santé.
Since Anoigma was an English company and Cloud Santé is a French company, this involves
transport in foreign commerce.  This transport was also part of the "execution or concealment
of a scheme or artifice to defraud."  The victims of this scheme include not only Harris and
other creditors of Anoigma but also government funders and private sector investors in Cloud
Santé since, as specified above in paragraphs 52 and 53, government funders and private
sector investors are being misled to assume that Cloud Santé has a strong technological base
due to the Intellectual Property.  However, as alleged here and in Claims I, III and IV, Cloud
Santé actually does not own the Intellectual Property.

79.     As stated in Midwest US  976 F. 2d 1016 paragraph 11, "Fed.R.Civ.P. 9(b) requires
that a plaintiff plead 'all averments of fraud [with] particularity,' and this rule is of course
applicable to allegations of fraud in a civil RICO complaint. See Graue Mill Dev. Corp. v.
Colonial Bank & Trust Co., 927 F.2d 988, 992 (7th Cir.1991); U.S. Textiles, Inc. v.
Anheuser-Busch Cos., 911 F.2d 1261, 1268 n. 6 (7th Cir.1990). Although Rule 9(b) requires
that a RICO plaintiff provide only a general outline of the alleged fraud scheme--one
sufficient to reasonably notify the defendants of their purported role in the scheme--the

complaint must, at minimum, describe the predicate acts with some specificity and 'state the time, place, and content of the alleged communications perpetrating the fraud.' Graue Mill, 927 F.2d at 992."

80.     The Defendants committed predicate acts of bank fraud as defined in 18 U.S.C., section 1344. This statute provides that "[w]hoever knowingly executes, or attempts to execute, a scheme or artifice: to defraud a financial institution, or to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises shall be fined not more than $1,000,000 or imprisoned for not more than 30 years, or both." The predicate acts are specified in paragraphs 81 to 83 inclusive below.

81.     Defendants France Telecom-Orange (through its agent Cristofini), Miaux and Ngouyombo committed bank fraud in depositing money in Bank National Paribas on behalf of Cloud Santé and in furthering the formation of Cloud Santé through the agency of Bank National Paribas, as evidenced by the documents signed and stamped by a bank official at the Bank National Paribas in Brest, France on December 21, 2009. This constitutes fraud since, as shareholders of Anoigma and fellow shareholders of Harris, the Defendants Cristofini, Miaux and Ngouyombo would be precluded from setting up Cloud Santé, a business competitive to Anoigma unless they did so legitimately through Anoigma and involved Harris. The primary victim of this fraud was Harris, since she was defrauded of her shares in Anoigma-Santé, as alleged below in Claim VI, particularly the discussion in paragraph 197 of alternative legitimate ways of forming Cloud Santé that would have had to include Harris's shareholding. However, creditors of Anoigma and potential investors in Cloud Santé were also indirectly victims of this fraud, as specified above in paragraph 78. It is

through the vehicle of Cloud Santé that the Defendants were able to defraud the creditors of

Anoigma, and Cloud Santé continues to provide fraudulent misrepresentations to potential

investors.

82.     On information and belief, one or more of the Defendants also committed bank fraud

by obtaining interest-free loan funds in or about April 2010 from the enterprise program in

the Bouche-Rhone region of France through fraudulent misrepresentations about the

ownership of Anoigma's Intellectual Property (claimed to be held by Cloud Santé.)   These

fraudulent misrepresentations formed the basis for receiving the interest-free loan funds as

well as other support from the program.  The fact that Cloud Santé received these funds is

indicated on its website that appeared on or about November 10, 2010 through a link to a

press release issued by the PACA enterprise program.  One victim here is the PACA

enterprise interest-free loan program since it was led to provide support to a deceptive

applicant; other victims are the companies that could otherwise have had access to these

interest-free loan funds.

83.     On information and belief, these funds provided the basis for the increase in capital

reserves of the company, as evidenced by the increase registered in Cloud Santé's capital

reserves in documents registered with the Aix en Provence, France Commercial Registry on

October 17, 2010, and available as part of a report that can be purchased on the Manageo

website.  Manageo is located in Aix-en-Provence, France.  On information and belief, these

funds are maintained in Cloud Santé's bank account with Bank National Paribas, and their

deposit constituted further bank fraud.  The victims here are potential investors since they

will be misled into thinking that Cloud Santé has more financial stability than it actually has.

84.     The Defendants committed acts of mail and wire fraud in connection with a variety of

schemes.  These are specified below under the following headings: (a) Mail and Wire Fraud

Related to the Offer of Securities to Potential Investors in Anoigma-Santé in November 2009

(paragraphs 88 to 97 inclusive); (b) Mail and Wire Fraud Related to the Offer to Purchase

Harris's Shares in Anoigma (paragraphs 98 to 115 inclusive); (c) Mail and Wire Fraud

Related to the Purchase of Shares in Cloud Santé by an Agent of France Telecom-Orange

and other Defendants (paragraphs 116 to 121 inclusive); (d) Mail and Wire Fraud related to

the Voluntary Bankruptcy of Anoigma (paragraphs 122 to 129 inclusive); and (e) Mail and

Wire Fraud Related to the Continuing Offer of Securities to Potential Investors in Anoigma-

Santé (paragraphs 130 to132 inclusive.)

85.     The Defendants' acts of mail and wire fraud fall into a range of the acts considered to

be fraud.  These include anything calculated to deceive, including positive acts, omissions,

concealment, breach of legal or equitable duty, and breach of a trust or confidence. Rybak v.

Provenzale, 181 Ill.App.3d 884, 899 (2d Dist. 1989).  They include fraudulent represent-

ations and concealment of material facts when there was a fiduciary duty giving rise to a duty

to speak. See Miller v. Lockport Realty Group, Inc., 377 Ill.App.3d 369, 377 (1 Dist. 2007),

H.K. Warner v. Lucas, 185 Ill. App. 3d 351, 354 (1989) and First Midwest Bank, N.A. v.

Sparks, 289 Ill. App. 3d 252, 260 (1997).   It is relevant to the Defendants' acts of mail and

wire fraud that "in a confidential or fiduciary relationship, the dominant party's silence alone

may constitute fraudulent concealment." Melko v. Dionisio, 219 Ill. App. 3d 1048, 1061

(1991). The particular type of fraud is specified with the relevant acts below, and the victims

are specified for each category.

86.     Since the specified acts of fraud occurred through communications by email or mail,

the place where the fraud took place is either the location of the sender or the recipient of the

email or letter at the time of the communication. Hammond Bale and Bale are located in

London, England. Cristofini, the agent of France Telecom-Orange, is located in Paris,

France. Ngouyombo was located in London, England until on or about late November 2009,

and after that date, she may be in London where she has resided or she may be located in or

near Meyreuil, France where the offices of Anoigma-Santé are located. From September

2009, Harris has been located in Chicago, Illinois except for the period from October 21,

2009 until December 3, 2009. Prior to September 2009, she was located in London, England.

On information and belief, Miaux is located in Beijing, China. Anoigma was located in

London, England. Griffin and King is located in Birmingham, England.

87.     Items posted on the internet are considered to be located where the office of the

organization posting the information is located. Companies House is located in Cardiff,

Wales. Manageo, the source of the documents specified in paragraphs 47 to 51 inclusive is

located in Aix-en-Provence, France. The information about the date of initial registration of

the Cloud Santé website and the date of its activation comes from the whois.com website,

and indicates that the entity registering the name is Enom, Inc. Enom, Inc. is a company

headquartered in Bellevue, Washington that registers websites. Whois is an Internet utility

that returns information about a domain name or IP address, and does not have any physical

address associated with the website. The location of other websites is provided where they

are mentioned.

(a) Mail and Wire Fraud Related to the Offer of Securities to
Potential Investors in Anoigma-Santé in November 2009

88.     As specified above in paragraph 35, beginning on or about May 2009, Harris relied

on Ngouyombo's transparency in providing necessary information about Anoigma's

commitments, activities and expenditures. However, Ngouyombo was engaging in the

fraudulent concealment of material facts in circumstances where there was a fiduciary duty

for her to speak, since Ngouyombo was the majority shareholder and Harris had the second

largest number of shares in a closely held company. Harris became aware of one of these

acts of fraudulent concealment in or about mid-November 2009 when Ngouyombo revealed

that she had committed to a financially binding contract at least two months earlier. The

fraudulent concealment of this information had led Harris to agree to other expenditures by

Anoigma during September and October 2009 in telephone conversations with Ngouyombo

when Harris was in Chicago and Ngouyombo was in London or traveling in France. If

Harris had been aware of the financial commitment of this contract, she might not have

agreed to these expenditures, and she might have called for other positive acts ensuring

greater transparency, as she did when the information was revealed.

89.     In response to Ngouyombo's revelation in mid-November 2009 about her fraudulent

concealment, Harris became concerned about issues of financial transparency and the

possibility of misleading investors. Since Harris and her background in corporate finance

were described in various documents for investors and she was characterized as an important

asset of Anoigma, potential investors located in England, France and the United States then

actively engaged in doing diligence about Anoigma would reasonably be relying on Harris's

reputation as a basis for investment. Harris expressed her concerns about issues of financial

transparency to herself and to investors in an email to Ngouyombo and Cristofini on or about

November 14, 2009.

90.     On or about November 15, 2009 Cristofini replied by email largely in French from his France Telecom email. He stressed the priority of obtaining investment and the importance of internal unity, thereby implying that Harris's concerns should not be expressed to potential investors, an example of concealment of a material fact. It was to France Telecom-Orange's interest that external investors buy shares of Anoigma-Santé since that would stabilize the company and enable its development prior to an acquisition or other more publicly apparent direct involvement. Therefore, through its agent Cristofini, France Telecom-Orange perpetuated the frauds of concealment of material facts from potential investors in Anoigma-Santé, identified in this paragraph and in paragraphs 93 to 97 inclusive below, making them the primary victims of this section of predicate acts. In addition, as specified below in paragraph 96, current creditors were also victims; as was Harris, as specified below in paragraph 97.

91.     Also on or about November 15, 2009, Ngouyombo stated in an email to Harris and Cristofini that Harris had access to all necessary financial information because Harris was a signatory on Anoigma's bank account. This was a fraudulent statement and concealment of material facts regarding the bank account. On or about November 19, 2009, Harris spoke by telephone to Anoigma's bank in London and asked for copies of the bank statements. Harris was told by the bank that only Ngouyombo could receive the bank statements, and that Ngouyombo had not signed the necessary form to make these statements available to Harris.

92.     On or about November 19, 2009, Harris sent an email to Cristofini and Ngouyombo informing them of what she had learned from the bank. She received no response either party and sent the email again on 20 November 2009, this time with a delivery receipt requested. Although she received the "read receipt" from Ngouyombo on November 20,

2009, she did not receive any other response nor did Ngouyombo sign the relevant form with the bank. This lack of response from both Cristofini and Ngouyombo is an example of failure to speak when there is a duty to speak, and constitutes fraudulent concealment.

93.     On or about November 24, 2009, Harris received a letter from Companies House dated November 21, 2009, noting that Anoigma's financial statements were due at the end of December 2009. The Companies Act requires all registered companies to file specific details and to file both annual financial statements and annual company returns, which are all public records. This notice from Companies House indicated that failure to file on time could result in civil and criminal penalties for directors and shareholders. Filing on time would provide timely, publicly available information about Anoigma's financial status both to creditors and to potential purchasers of shares of Anoigma, particularly since investors interested in purchase of such shares were engaged in due diligence investigation of Anoigma at that time.

94.     On or about November 24, 2009, Harris had tried to communicate with Ngouyombo and Cristofini from Harris's Anoigma email account but the email account was not functional. By closing Harris's Anoigma email account on or about November 24, 2009 at a time when potential investors had been given that email address as a source for gathering due diligence information about Anoigma in making their decision about purchasing its shares, the Defendants prevented these potential investors from being able to contact Harris and gather information about the financial status of Anoigma. This constitutes fraudulent concealment of a material fact.

95.     On or about November 24, 2009, Harris had sent an email to Ngouyombo from Harris's personal email account, which stated "Barbara, The annual accounts are due with Companies House on 31 December 2009. These should be reviewed and approved by all

Directors before submission. Have you arranged for the preparation of the accounts by someone other than me? If so, please let me know who that is. If not, please provide me with all the information I have previously requested to date, so that I can prepare accurate and transparent accounts. Also, either there is a technical glitch or it appears that you have closed my anoigma email account. Could you please explain what is going on if you have in fact closed it. Kind regards, Marcia." Harris received no reply. This lack of response constitutes fraudulent concealment of a material fact.

96.     On or about December 7, 2009, without discussion with Harris and without informing her in advance of this action, Anoigma filed an extension of the date for filing its financial accounts with Companies House. This constitutes fraudulent concealment of a material fact from Harris. The extended filing date was January 31, 2010. That extension meant that no public information about Anoigma's financial status would be available to potential purchasers of Anoigma shares or to current creditors until that date, even though this was a period when investors were engaged in due diligence about purchase as a result of presentations by Anoigma. This was the period in which the Defendants were planning the fraudulent bankruptcy of Anoigma, as specified in paragraphs 123 and 124 below. This extension of filing date constitutes fraudulent concealment of material facts from potential investors and current creditors, as well as from shareholders and Companies House in a situation where the Companies Act had imposed a duty to speak, and where the intent of that duty to speak was frustrated.

97.     In a memorandum sent by Harris by email on or about November 30, 2009 to Cristofini, Miaux and Ngouyombo (the other shareholders of Anoigma) with a copy to Bale, Harris had expressed a willingness to agree to the shareholders' General Meeting on January

5, 2010 despite its lack of procedural validity provided that, *inter alia*, her various concerns also would be addressed at the meeting. Among others, these concerns included (in addition to the problems implicit in investors not having access to Harris via Harris's non-functional Anoigma email account) concerns regarding financial and other transparency to potential purchasers of Anoigma's shares. Harris received no reply from Defendants Cristofini, Miaux and Ngouyombo (the other shareholders in Anoigma) about these issues, even though as other shareholders in a closely held company, they had fiduciary duties to communicate with Harris. Moreover, Bale, in an email of December 1, 2009, refused to allow Harris to participate in the General Meeting by telephone and refused to include Harris's concerns in the agenda of the meeting, even though he was an agent of the shareholders. This constitutes facilitation of concealment of the material facts that Harris wanted to present in a situation where she had a duty to speak and was attempting to exercise that duty.

(b) Mail and Wire Fraud Related to the Offer to Purchase Harris's Shares in Anoigma

98.     The purposes of these frauds were to deprive Harris of her shares in Anoigma-Santé so that France Telecom-Orange could pursue its interests in Anoigma-Santé without Harris as a "watch-dog" and/or so that France Telecom-Orange could increase its control of Anoigma-Santé by seizing Harris's 19% shareholding through a fraudulent bankruptcy of Anoigma and then dividing Harris's 19% shareholding between Cristofini, the agent of France Telecom-Orange and Miaux. It is also alleged that the significant increase in Miaux's percentage (from 5% in Anoigma to 23% in Cloud Santé) was for the purposes both of having a significant shareholder who was not a France Telecom-Orange employee (thus shielding France Telecom-Orange from suspicion of fraudulent manipulation of Anoigma-Santé) and of encouraging Miaux not to complain about the fraud involved in destroying